WARNER VS. FOUNTAIN and others.

28 405
79 464

REAL ESTATE — NOTICE OF PRIOR RIGHTS—ESTOPPEL: (1, 2) *Notice to grantee of land, of rights of prior grantee.* (3) *Estoppel* in pais, *against claim to land.* (4) *Rights of owner against one who has made improvements in good faith.*

1. Persons who took deeds of land *after* the recording of a deed from their grantor to a railroad company covering in part the same land, are chargeable with notice of the company's rights; and the existence of a fence erected by it along the track, at the time of the conveyance to such persons, does not estop the company from claiming *beyond* such fence.

2. One who took possession under a land contract from said grantor, *before* the company's deed was recorded, but after it was made, and when the company was in possession thereunder, is also bound to take notice of its rights.

3. The fact that A. permits B., without objection, to erect a house upon A.'s land, and builds a division fence between the premises claimed and occupied by himself and those so claimed and occupied by B., will not estop him from claiming the latter premises, where both parties were equally ignorant in fact, and equally chargeable with notice, of the true boundary.

4. If A. gets peaceable possession of the land with the house upon it, B. cannot recover the value of such house in an action at law, nor maintain trespass against A. for entering upon the land and removing the house to another part of his own premises.

APPEAL from the Circuit Court for *Outagamie* County.

The action was against *Fountain* and two other persons, for breaking the plaintiff's close, and taking and carrying away therefrom without his consent, a dwelling house situated thereon, the property of the plaintiff, and converting the same to their own use, to plaintiff's damage $400. The premises thus claimed as plaintiff's close are described in the complaint by the following boundaries: " commencing in the east line of Appleton street, in the second ward of the city of Appleton, * * * one hundred feet north of the Chicago & Northwestern Railroad (*as it was fenced in* 1865 *to* 1869), and running thence north forty feet; thence east one hundred feet; thence south forty

feet; and thence west one hundred feet to the place of begin-
ning, being a part of the southwest corner of block seven accord-
ing to Kimball's Addition to the city of Appleton." The de-
fense was, in substance, that the premises so described, includ-
ing the building removed, belonged to the defendant *Fountain*.
The other defendants removed said building at his request.

On the 11th of February, 1861, David Kimball, who was
then the owner, executed a quit-claim deed to the Chicago and
Northwestern Railway Company, of certain lands, including a
tract in the northwest quarter of section 26, of a certain speci-
fied town in said county; which tract is described, with refer-
ence to the section lines, and with reference also to the central
line of the track of said company's road as then located at that
place, the northerly line being defined as running parallel with
the central line of said track, and at a distance of *eighty-nine
feet* therefrom. The deed contains these words: "This con-
veyance being upon the condition that the grantees shall erect
at their own cost, suitable fences on the division line of the
land hereby conveyed." This deed was not recorded until
January 26, 1866. On the 7th of December, 1861, the plat of
Kimball's Addition to the city of Appleton (bearing date the
previous day) was duly acknowledged and recorded. Block 7,
upon this plat, occupies such a position that the strip of land
granted to the railroad company by the aforesaid deed, extends
across the southwestern corner of the block. In 1861 or 1862,
the company built a fence along its track across said block 7,
parallel with the center line of its track, and only *thirty-nine
and a half feet* distant therefrom, on the northern side of the
road. The width of the land enclosed by the company at this
place, was about the same as at other points along the line of
its road through the city of Appleton. The fence remained in
this position until the fall of 1869, when the company asserted
its right to the rest of the strip deeded to it on that side of the
track, and used the same for a side track, etc.

On the 13th of September, 1865, David Kimball, by Reeder

Smith as his attorney, entered into a contract with Joseph Thill for the sale to the latter of a piece of land in said block 7, " commencing in the east line of Appleton street at its intersection with the *north line of the Chicago & Northwestern Railroad*, and running thence north along the east line of Appleton street one hundred feet; thence east one hundred feet; thence south to the *line of said railroad;* and thence *along the line of said railroad.* to the place of beginning." The defendant *Fountain* afterwards bought Thill's interest, and took a deed of the premises, described in the same manner, from David Kimball and Reeder Smith, in February, 1867.

On the 15th day of October, 1865, David Kimball, by Reeder Smith as his attorney, entered into a contract with George E. Daniels, for the sale to the latter of certain land in said block 7, described as follows: " Commencing at the east line of Appleton street, *one hundred feet north of the Chicago & Northwestern railroad, and at the north line of land sold to Joseph Thill*, and run north forty feet, then east one hundred feet, then south forty feet, then west one hundred feet to the place of beginning." On the 13th of December, 1866, Daniels assigned this contract to one Olmstead, and on the 18th of the same month a deed of conveyance was executed to Olmstead by David Kimball and wife and Reeder Smith and wife, which deed was recorded the next day, and describes the premises conveyed in the same language used in said contract, except that the words " and at the north line of land sold to Joseph Thill," are omitted, and the following words are added: " being a tract or portion of land in the southwest corner of block seven in Kimball's addition to the city of Appleton, according to the recorded plat of the same." In July, 1869, Olmstead executed to the plaintiff, for value, a deed of the same premises.

Immediately after the execution of the contract with Thill he took possession as under such contract of a piece of land in the south-west corner of said block 7, immediately adjoining *the railroad fence*, with a front of one hundred feet on Appleton street, and

a depth of one hundred feet; and built a cooper shop upon said tract very near said railroad fence, and almost wholly upon the land conveyed to the railroad company by the terms of the deed to it above mentioned.    Daniels also, immediately after the execution of the contract with him, took possession of the strip forty feet in front on Appleton street and one hundred feet in depth, immediately adjoining on the north the tract so occupied by Thill; and he was put in possession by Reeder Smith, as the agent of Kimball, who determined the southwest corner of said lot by measuring one hundred feet northward on Appleton street from the railroad fence.    In the fall of 1866, Daniels built, on the lot occupied by him, the house mentioned in the complaint, worth several hundred dollars; and he testifies that Thill knew of his building such house and never made any objection thereto.    In the spring of 1867, *Fountain* went into possession of the Thill lot, and Olmstead went into possession of the Daniels lot; and in August of that year *Fountain* built a fence as a line fence between himself and Olmstead, at a distance, measured on Appleton street, of one hundred feet north of *the railroad fence.*    The plaintiff testifies that when he purchased of Olmstead in July, 1869, he paid $450 in cash, and that he bought in good faith, not knowing that any other person claimed the land occupied by Olmstead; that the old railroad fence was still standing at that time; that he first heard of the railroad company having trouble about the line of its land in October, 1869, and this was the first intimation he had of any difficulty about the boundaries there; that after he purchased he put a tenant in the building, who held it till sometime in November, when he left without plaintiff's knowledge; that he (plaintiff) went after the key, and on going upon the premises was ordered cff by the defendant *Fountain,* and, not wishing trouble, he left; that he made a partial arrangement with Reeder Smith for a lot on the opposite side of the street, in order to save litigation, and went to the premises in dispute with men to move his house on to said lot, and *Fountain* refused to let him do

so; and that he (plaintiff) forbade defendant's moving the house cr interfering with the premises in any manner. Afterwards *Fountain*, with the aid of the other defendants, removed said house to another portion of the tract claimed by him, and built a fence on the north line of said tract, locating it at a distance, measured on Appleton street, of one hundred feet from the northerly line of the land deeded to the railroad company as above described. The company, in the meantime, had taken possession of the strip between said line and its former fence, for the purpose of constructing a side track, etc.

Several exceptions were taken by the plaintiff to the rulings of the court in respect to evidence. Reeder Smith, as a witness for the plaintiff, was asked whether the purchasers of the lands in said block 7 [Thill, Daniels and others], did not "build and establish their lines consecutively, measuring from the north line of the railroad track *as it was fenced previous* to the year 1869;" and the question was ruled out. Another witness for plaintiff, who testified that as a surveyor he had determined the lines of the Thill lot and the Daniels lot, by measuring on Appleton street from the old line of the railroad company's fence, was asked on cross-examination whether he knew where the north line of said railroad was at the place in controversy; and also whether he had compared the location of said line as shown upon a certain map exhibited to him, with the description in the aforesaid deed from Kimball to the company. Objections by the plaintiff to these questions as incompetent and immaterial, were overruled; and the witness answered, in substance, that he had made such comparison, and that the northerly line of the premises described in said deed, was fifty feet north of the line of said fence. The plaintiff also objected to the introduction in evidence, for defendants, of said deed to the railroad company, on the ground that "defendant and plaintiff each claimed title to the land in dispute under a contract of sale from the same person under whom the railway company claimed its title; and that under said contract defendant went into possession and

established his lines without knowledge of this deed to the railway company, and prior to the recording thereof." The objection was overruled, and said deed read in evidence.

· The plaintiff asked the following instructions, which were severally refused: 1. That the actual possession, occupancy and enclosure of land is *prima facie* evidence of title in the occupant, and this presumption cannot be rebutted by proof of the forcible dispossession of such occupant by another. 2. That if defendant *Fountain* had fixed the lines of his lot, and built fences thereon between his and plaintiff's land, and acquiesced therein for a long period of time, he was estopped from claiming the land or improvements of the plaintiff beyond said line and fences. 3. That if the plaintiff, or those under whom he claimed, had made valuable improvements upon the lands so claimed by him, with the knowledge and acquiescence of the defendant *Fountain* or of any person under whom he claimed, said defendant was estopped from claiming such improvements as his own, even if it afterward appeared that the land on which they were made belonged in fact to him. 4. That if said defendant refused to allow the plaintiff to have his improvements, made under such circumstances, and prevented him, by force or otherwise, from taking the same from the land within a reasonable time, he was liable to plaintiff for their value in an action for their conversion. 5. That a man has no right to take possession of his own property, real or personal, by force or with strong hand or a multitude of people, but only in a peaceable manner. 6. That if a man should so enter into the possession of his own land, it would give him no right to improvements made in good faith by a person claiming title to the premises for a valuable consideration and by deed or contract therefor. 7. That any person aiding or assisting defendant *Fountain* in removing the property of plaintiff from the lot, or in holding the possession thereof as against the plaintiff, was equally liable with said *Fountain* for damages sustained by plaintiff through such removal or interference. 8. That

the word "railroad," as used in the deeds under which the parties claim, must mean that portion of the railroad land fenced and used for railroad purposes at the time of the conveyance, and not any land not then so held and used. 9. That the deed of conveyance to the railway company, although executed in 1861, could have no binding effect upon any conveyance made by the same party, of the same land, previous to the time of its record, to a person who purchased in good faith, without notice, whether the evidence of such purchase was a contract of sale or a deed from the owner of such land.

The court instructed the jury to find for the defendants. Verdict accordingly; new trial denied; and plaintiff appealed from a judgment on the verdict.

*Warner & Ryan*, for appellant, contended, 1. That the land in question being a part of the plat of block 7, in Kimball's Addition, no record of any deed describing land situated in said plat by government survey is any notice to subsequent purchasers in good faith, unless the description is so plain that any one can understand it without making a survey of the land. R. S., ch. 47; Laws of 1860, ch. 332 ; *Weisbrod vs. R. R. Co.*, 20 Wis., 419. 2. That Thill and *Fountain* having purchased in good faith, entered into possession, and made valuable improvements on the land with the knowledge of the railway company, said company is estopped from claiming any land beyond the line of the fence erected by it as the boundary of its land in 1861 or 1862 (*Adams v. Rockwell*, 16 Wend., 285 ; *Dibble v. Rogers*, 13 id., 536 ; *Rockwell v. Adams*, 6 id., 467 ; *Jackson v. Ogden*, 7 Johns., 238 ; *Jackson v. Murray*, 7 id., 5 ; *Jackson v. Ogden*, 4 id., 140 ; *Wendell v. Van Rensselaer*, 1 Johns Ch., 343 ; *Laverty v. Moore*, 32 Barb., 347, and 33 N. Y., 658 ; 30 N. Y., 226 ; 44 Barb., 218 ; 3 Hill, 215 ; 9 Wend., 65 ; 2 Washb. R. P., 2d. ed., 456, 458); and that this rule applies with equal force as between the plaintiff and *Fountain*. 3. That the deed to the railroad company, not having been recorded until after the sale to Thill, who purchased in good faith, was not notice

to him or any one claiming under him, nor to persons who purchased subsequently and bounded their land by his purchase. *Ely v. Wilcox*, 20 Wis., 523 ; *Fallass v. Pierce*, in this court, not reported (see 30 Wis.); R. S., ch. 86, §§ 25, 34, 35. 4. That the word " railroad," as used in the deeds under which the parties claim, must mean the land then fenced and used for railroad purposes. 5. That even if the land on which the house stood should be held to belong to *Fountain*, yet the defendants, having seized plaintiff's house by force, removed it from said premises, and appropriated it to their own use, were liable to plaintiff for its value. R. S., ch. 151, sec. 1, and ch. 141, sec. 30.

*Hudd & Wigman*, for respondents, as to the construction and effect of the deeds to Olmstead and *Fountain*, cited *Cleveland v. Flagg*, 4 Cush., 76; 9 Met., 150; 1 Mich., 421 ; 2 Md. Ch., 381; 27 Barb., 196 ; 2 Washb. R. P. (2d. ed.), 630, and authorities cited in notes 1 to 4.

The following opinion was filed at the January term, 1871:

COLE, J. We are unable to see any error in this record which could possibly have prejudiced the plaintiff. The decisive fact in the case is, that the deed to the railroad company was upon record before any purchaser of the various lots received his deed from Kimball. True, Thill, under whom the defendant *Fountain* claims, received his contract and went into the actual possession of his lot in September, 1865. And, although the railroad company had not then put its deed upon record, yet it was in possession of the premises conveyed by Kimball in 1861, and Thill was undoubtedly chargeable with notice of the rights of the company; and when Olmstead received his deed in December, 1867, the railroad deed was upon record, and his lot was described as bounded by a line " commencing on the east line of Appleton street and *one hundred feet north of the Chicago and Northwestern railroad*," etc. Thus, in the description of his lot, there was direct refer-

ence to the lot owned by the railroad company, and he was bound to know where the north line of the company's lot was. It is said that when Thill went into possession, he fenced his lot, bounding it on the south by a fence which had been made by the railroad company. Suppose he did, it probably would not be claimed that at the time of the execution of his contract in September, 1865, he had no notice of the prior unregistered deed of the railroad company. He was bound, therefore, to ascertain where the north line of the railroad lot was, and whether this fence was on the line. And certainly all subsequent purchasers, who bought after the railroad deed was upon record, were bound at their peril to find out where the north line of the railroad premises was. If they chose to act on the assumption that the old railroad fence was on the north line of its lot, they could do so; but this would not conclude the company, or in any way affect its rights. There is no question of adverse user in the case. But the simple question is, Was the railroad company estopped from claiming to its real boundary line on the north, notwithstanding this fence? And upon that point it seems to us there is hardly room for argument. For it would be a very unsafe doctrine to establish, that a person, by neglecting to fence all the land he owns, forfeits the title to the unenclosed portion. These parties doubtless all supposed the old railroad fence was on the north line of its lot. In this they were simply mistaken, and they must abide the consequences of this mistake. The railroad deed, as we have said, was upon record, and all persons who had any interest in the matter could readily ascertain what land had been conveyed to the railroad company. This probably would have involved the necessity for a survey, because, when the railroad deed was executed, Kimball had not made his addition to the city of Appleton, and the land in that deed could not be described by lots and blocks. But there surely was no difficulty in ascertaining the land conveyed to the company, and the north line of its lot. And, under the circumstances of this case, there is no doubt that third per-

sons were chargeable with constructive notice where it was. This being so, it decides this case, and a consideration of other questions becomes immaterial.

*By the Court.*—The judgment of the circuit court is affirmed.

The appellant having moved for a rehearing, the following opinion was filed at the June term, 1871:

COLE, J. On the motion for a rehearing, it is insisted that the plaintiff was entitled to recover the value of the dwelling house. The action was for a trespass *quare clausum*, and to recover the value of this dwelling house removed from the close of the plaintiff. It is very apparent, however, as above stated, that the plaintiff did not own the land upon which the dwelling was erected, although it is doubtless true that Daniels, under whom the plaintiff claims, erected this building under a mistake as to the proper boundaries of his lot. But neither the defendant nor his grantors were in any wise responsible for this mistake as to the true lines. ˙ They were all in error in assuming that the old fence built by the railroad company was on the north line of its lot. The defendant did nothing to mislead the plaintiff, nor any one through whom he claims. True, Thill knew that Daniels was erecting this house. But he was as ignorant as was Daniels himself as to the true boundaries. But the railroad deed was upon record at this time, and both were equally chargeable with notice of the property conveyed to it. They had equal means of ascertaining where the lines of their respective lots were. And when Thill saw Daniels building this house, he had no actual knowledge that it was upon his land. He therefore gave no notice of his claim to the land, because he did not know that he owned it. This being so, upon what principle can the plaintiff recover for the value of the house ? Possibly if the defendant had brought an action to recover possession of the lot upon which the house stood, the plaintiff might have recovered its value under our betterment law, R. S., ch. 141, secs. 30 *et seq.* Or if for any reason the

Warner vs. Fountain and others.

defendant had invoked the aid of a court of equity in support of his rights, possibly he would have been compelled to pay for the improvements made by the plaintiff or his grantors upon the land. The evidence shows that the defendant was in the peaceable possession of the lot upon which the house stood, and when the plaintiff went there last November to forbid him from moving the house, the defendant ordered him off the lot. So the defendant obtained possession of the lot in some way peaceably, and without resort to legal proceedings of any kind. And the plaintiff now seeks in this action a judgment for the value of the dwelling house. We do not see how he can have such a judgment, without introducing a new principle into the law of this state. In *Putnam v. Ritchie*, 6 Paige, 390, Chancellor WALWORTH says that he was unable to find any case, either in this country or in England, wherein a court of equity even had assumed jurisdiction to give relief to a complainant who had made improvements upon land, the legal title to which was in the defendant, where there was neither fraud nor acquiescence on the part of the latter after he had knowledge of his legal rights. And if a court of equity would not go to the extent of decreeing compensation for the house upon the facts, had the plaintiff invoked its aid, it is difficult to perceive upon what principle a court of law could give him a judgment for its value in this action. All the parties seem to have acted under the mistaken belief that the old railroad fence was on the north line of its lot, although the means of information as to the extent of that lot were within their reach and equally accessible. We think the motion for a rehearing must therefore be denied.

*By the Court.*—Motion denied.